Valador v. HTC. Mr. Kale. Pleased to hear from you, sir. Good to have you here. May it please the court. My name is Douglas Kale. I'm here on behalf of Valador, the appellant in this matter. I'm going to address my comments this morning on our argument involving trademark infringement and some evidentiary issues we've raised in our briefs and otherwise rely on our briefs as far as the other arguments raised. You don't waive anything if you don't argue in front of us. Everything in your brief, we know that. Thank you, Your Honor. Now, as this court observed back in the Dix-Fortingas case, this court has observed the reverse confusion doctrine and I'm hoping that today and with this case, the court accepts this case as a time for the court to adopt and apply the reverse confusion doctrine. As the Third Circuit Court of Appeals noted, without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks. That's our case. Valador is the smaller senior user of the VIVE mark. The defendants are much larger. Juan, who is it you think is going to be confused? Aren't your clients sophisticated government clients? Well, the consumers, first of all, are government. Our clients are not just the government. Our clients are also, as we've established, commercial clients. And of course, we had ventured into and tested the recreational deal with the Moundsville Slammer software that we distributed to 43,000 consumers out there. And what percent of your market is the government? Certainly, the overwhelming market is government. Overwhelming market. What percent? Oh, I'm going to say 90 plus percent. 90, 98 percent? I don't believe it's quite that high, but certainly in the up in the 90s percent. Also, we do have commercial clients, which our briefs address. You do a lot of work with NASA, don't you? NASA? Yes, Your Honor. That's your biggest customer? NASA is one of the big ones. And of course, our client using is 3D software, which was marked with the VIVE trademark. Use that software to determine what caused that Challenger spaceship to crash. So, yes. Well, that says that you may have a good product. That doesn't say that you have a big, broad market of unsophisticated users. That, to me, says you have a market. And I think it may be 98 percent of your revenues come from you have a rather limited market, but you have a sophisticated limited market. Well, don't you? Let me say this about that. Our market, of course, we've established in the in the evidence of the case is our market includes government, includes commercial, and within that includes health care. The VA is one of our customers. The VA provides health care. And you saw where the defendants acknowledged that their VIVE system, in addition to its record. The VA does a lot of things besides health care, though, doesn't it? Sure, it does. I mean, all your stuff may be health care. I don't think the VA does things other than health care. Sure, it does. I think, though, for the most part, people view the VA as with respect to its health care component. And in terms of the market overlap, again, the VA is a customer, established customer client of Valador. And there is a market overlap. The defendants have acknowledged that they use a VIVE system in the commercial field and in the health care field. So, we have the overlap within that marketplace of the use of the VIVE mark. In terms of the comment about sophistication, at the end of the day, governments and commercial entities are comprised of people. People who view our software, evaluate our software. But to say that they are more sophisticated or less sophisticated than people who can operate other software devices, yes. I'm sorry, I thought you. Oh, no, trust me. When I have a question, you'll know it. Okay, I thought that was a gesture. Sorry. So, we have the overlap market. That was an error, of course, the trial court made in determining that there was no overlap, ignoring our venturing into the recreational field and, of course, their venturing and existing this in the commercial field and the health care field. Now, understanding that we're at the stage of asking the court to reverse the trial court's granting of summary judgment, we ask for a jury trial. And I think then we have to ask, could a jury reasonably have concluded that there would be a likelihood of confusion with respect to the defendant's use of our mark? There are nine factors, not all of them equal, not all of them apply. Could a jury, when you view the evidence at this stage in the light most favorable to us, how do those factors line up? I contend that there are five of the factors that favor Valador. Let's tick through them ever so briefly. The strength of the mark, conceptual strength, the USPTO registered the VIAF mark. That by itself presents a prima facie evidence that our mark is not weak. It's not generic. It's not descriptive according to that registration, which would make it weak. And the USPTO registration is prima facie evidence that it's not weak. Commercial strength, the court observed that in reverse confusion, the focus is on the strength of the defendant's use of the mark, the commercial strength. With respect to that, as you saw, there are over 280 million hits when a person does a Google search of the term VIAF. The evidence also is the defendant spent a number, a significant sum of money. What do you think the very strongest argument, the very strongest point for your side is? What is your strongest factor? Sure. If you put our VIAF mark on a big board right here, right next to their VIAF mark, they are identical. They argue not. It's just not the case. If you look in the record, they don't always, but at times they show the VIAF mark in a simple block letter VIAF by itself. Sometimes they show HTC VIAF, but not always. They, on their website, state in quotes HTC VIAF with the registration mark. So that would be a similarity of the two marks to consumers? They're identical. What factor is it? Which of those nine factors do you think is most in your favor? Number one, similar to your mark. Is that the first one? Yes, sir. I thought there was a difference in the font. Not always. Not always. Sir, they show it different at times. But they're different at times, yeah. They're identical at times. But they're not always identical. They're not always identical. I thought you said they're always identical. If I did, I misspoke. They do show it identical at times. They show it different at times. What you said was if you put them side by side, they're identical, but that's not always true, is it? No, they have variations on it. At times, they include HTC Vive, but not always HTC Vive. At times, they say Vive Port. Who uses different fonts? You all or them? Well, we use the same font at times. At times, but one of you uses the same font all the time and one of you use all kinds of fonts. Yeah, I believe we mean Valador use the same sort of block font most all the time. They use different font. They use some different fonts. Do you have a little image that's attached to your Vive? Do you have a little image most all the time or not so? No, not all the time and nor do they all the time have any image attached to Vive. Second most. You think your strongest point is the similarity of the two marks. That's what you say. Number one. Number two. Number two, is that correct? That's number one. And even sometimes because of the different fonts, they aren't exactly the same. At times. They're not exactly the same. Okay, that's correct. But at times there are number two is what is the fact on their website in terms of is the consuming public likely be confused on their website as you've seen in there. They have HTC Vive with your registration mark. They themselves telling the world that that mark is registered them. It's not true. It's not accurate. So could a consuming public see that as they well they meaning HTC with its Vive must be the source of in this case our and the consuming public is who the 5% that aren't sophisticated government clients. Well it with respect to their website. It's anyone who looks at the internet as to you as to you your your market. That's the question. Who's going to be confused about those marks that are sometimes the same but sometimes not the same or that registration mark what consuming public what consumers are going to be confused by that any and all of the individuals who work for any of the government agencies or the commercial clients of our of Ballard or who go to the internet and who's and who know about because they've been dealing with us know about that. We're going to stop you. That's what's going to be confused. Be a sure an engineer who is who works for NASA who deals with us who goes on the internet. They know about our valve mark. They do what they do. They go to the internet and they search vibe. They say, oh my goodness. Here are 280 million hits on vibe. Gosh, I see here that HTC has registered vibe. Well, maybe HTC is really the course of this software that we're buying from from Valador. So to say that because NASA sends ships out and there's evidence that there are some engineers who went there and were confused by that. No, no, we don't have evidence of the thousands of engineers or one of those thousands who went there. We did not would not go to NASA. You don't have any. You don't have any. Do you have any evidence of actual confusion? Yes, under your hypothetical. Yes, we have a survey that was performed that was performed in accordance with all appropriate standards for surveys by an individual. And in that survey, there are people who say we have gone to the website and seen this vibe and we confuse the companies. No, no. You're what was done is the website. The survey presented side-by-side images as the respective parties presented. Was the survey done by that expert that was excluded? It was. Okay. It was excluded. It was excluded, which is part of our argument. So you're and you're feeling that. Yes, sir. Inclusion ruling, you know, I am ruling. Right. You got we are here. We believe you said you are come out better on five out of the nine factors. Yes. Yes, your honor. All right. Now, how many of them did Judge Ellis say you came out better on? Yeah, sure. The strength of the market. How many? Mark? Five. How many did Judge Ellis? We think there's three neutral. How many did Judge Ellis agree you came out better on? On none of them. He didn't give you any of them. You say you're entitled to five. Yes, your honor. And the three of them, you come out square and you lose on one. Well, if he won, I don't know. But Judge Ellis didn't give you credit for winning any of them. He didn't. Okay. Well, and I didn't, I just, I didn't, I haven't made the count. So I just wanted to make sure what your count was. Will I get that? Let's talk about your intent. So intent is one of the five that we contend favor us. You're better on intent. We contend that understanding the trial court decided against this because with respect to reverse confusion, the focus is, as addressed in the Corwin case out of the circuit, did the defendant know of our mark when they began using the mark? The trial court found that they were unaware of our mark. Well, the facts were established. They concede they performed a trademark search before they started using the mark. So the trial court's finding that they were unaware of our mark is just, it's contrary to the evidence. So you're saying it's erroneous then? You made it erroneous? You think the factual finding was clearly erroneous? Oh, absolutely. As we briefed, that's absolutely erroneous. The defendants acknowledged that they cut their trademark search. And saw your mark? Well, it's, it's, a jury could reasonably conclude. No, no, no, no, no, no. They did not. Answer my question. Did they concede they did the search and saw your mark? No, didn't concede that. They did the search and then started using the mark. Of course, our VIVE mark is, I think it's reasonable to conclude that if someone looks for the term VIVE, they're going to see our VIVE mark. Can you just tell me which five of these factors, just list them, which five from strongest to less strong do you think you went on? Just name them for me. Identical marks. Similarity of groups of goods and services. It's all software. The strength is number three. Content number four. Advertising number five. Shall I comment further? Or do you want me to stop naming them? No, tell them to me again. I'm just looking through the factors. Yes, of the five. Just name them. Just say what they are. Number one, similarity of marks. Got it. Number two, I'm going to say similarity of goods and services. Okay. Number three, intent. Okay. Number four, strength. Number five, advertising. Okay. Okay, go ahead. Well, my time just ran out. Okay. Well, you saved some time. I did, yes. Yep. Thank you. We'll get you back up here. We're going to hear from Mr. Stewart. Mr. Stewart, good to see you. Good morning, Your Honor. May it please the Court. Your Honor, at its core, Your Honor, at its core, this case, frankly, doesn't fit into the normal paradigm of a trademark case, trademark infringement case. And Judge Ellis perhaps said it best, and I would quote him as saying, plaintiff and defendants sell dissimilar things through different channels in disparate markets. Well, why didn't that fall in the normal paradigm? That would just be the facts was way in your favor in the normal paradigm. We believe the facts are so far out of... No, but I'm saying, but we get cases all the time where they're not the same market, too much sophisticated. Seriously, aren't those just doing an argument that you win on the factors? Well, we certainly believe we win on the factors, Your Honor. But why do you say this isn't a... Well, why do you say it's not a typical case because somebody doesn't normally bring such a weak case against you? I mean... Your Honor, we believe this was a very weak case. I know, but you didn't answer my question. You just said it's not a typical paradigm. Why is that so? Well, Your Honor, it's a... The plaintiff, Valador, is asserting that it's a reverse confusion case, but in the context of reverse confusion, the sophistication of the consumers and the market that's being addressed is critical. And here, under reverse... But do you take my point? They can make the case against you. That wouldn't be unusual. I think, I don't want to go any further. It just may be they can make this reverse confusion case, but their case is so weak that they just can't possibly win or something like that. They didn't do anything out of the extraordinary brain in this case against you. Well, Your Honor, I believe that the problem with this case is that Valador sells consulting services. I know, I know what they say. To sophisticated government agencies, and we sell hardware products to general consumers. The price difference between these markets is incredible. And under reverse confusion theory, which we've only recently learned in the reply brief, is the official theory that they're moving forward with. Under that theory, they would have to argue that a procurement officer at NASA, who's reviewing RFP responses... Is there any evidence in the record of confusion by that type of officer? Absolutely not, Your Honor. And in addition... Is there any evidence in the excluded survey along those lines? No, Your Honor. In fact, now that we know, based on the reply, that reverse confusion theory, that expert... You're saying that reverse confusion was never raised in this case until the reply brief on appeal? No, Your Honor. Was it raised in the district court? It was, Your Honor. The issue was that it was unclear whether the plaintiff was committing to a reverse confusion theory or keeps options open. And so, for example, the Bonnie expert report... May I suggest you not try to oversell your case? Why did you say it wasn't clear until the reply brief then? Well, for example, Your Honor, the Bonnie expert report that they're arguing about the exclusion, that expert survey surveyed, according to Mr. Bonnie, HTC's prospective customers. That would be a survey for a forward confusion case, not a reverse confusion case. So if they were truly pursuing a reverse confusion case, they wouldn't have appealed the Bonnie issue. And so, for that reason, our brief in this court addresses both theories because, frankly, we just weren't clear on what their commitment was. You were misled until the reply brief? I don't want to allege we were misled, Your Honor. We just didn't know because... You said you hadn't read, addressed much stuff that didn't come up or something, that they abandoned some of it? We did, Your Honor. For example, the exclusion of the Bonnie expert report. It's not necessary because that sampling was allegedly done of HTC prospective consumers. We don't agree with that, but that report is for forward confusion, not reverse confusion. So that issue doesn't need to be resolved by this court. It's not relevant. We got some cases say you can't raise issues on appeal in your reply brief. You have to raise them fairly to give your side a shot at  No, Your Honor. I believe that there are some specific arguments that were made in their opening brief. You overstated your case. You opened by overstating your case and focusing on the reply brief. That's now why we're taking the time you want to use to argue the merits of your case to get straight. You should even get to that point. Do you see what I mean? I take it, based on what we've just heard, is what you really say is they've argued a couple theories in this case, and it's clear to us now they really are now focusing on one of those theories. Is that what you're saying? That's correct, Your Honor. I apologize. They're willing to plant their feet on reverse confusion. So they're giving you the rest of them. Now, it seems that now, yes, reverse confusion is their theory, and I heard Mr. Kales say that he would. He might get up and say he's not giving up on anything. I think he might. It's possible, Your Honor. He says that he ought to win on five out of the nine factors. And Judge Ellis said he didn't win on any of them. How many do you think he wins on? I think he wins on zero. How many do you think you win on? All of them. How many does Judge Ellis say you win on? All of them. Okay. What about the similarity? He said his strongest was similarity of the two marks. And frankly, Your Honor, what Mr. Kale was explaining was the nature of the survey that was excluded by Judge Ellis, which was essentially, if I wrote the word vive on two pieces of paper and put them in front of you and said, do these look the same? You would say, yes, they're identical. And that's basically what Mr. Bonney did. So just let me say this, though. You know, this court is a little more sophisticated than  Don't you think so after you have questions? I do, Your Honor. Because didn't you hear a question about fonts and whether or not there was a little icon or logo that went with it? So we don't think that, do we? No, absolutely not, Your Honor. But my point is, on the similarity of the mark analysis, our mark is used as Judge Ellis described. And I would mention, too, that these facts that are set forth in Judge Ellis's order, six pages of facts, those are undisputed facts. And we have pin sites to all of them in our brief. Well, it's on summary judgment. But the district court was advised to give the facts to the other side, wasn't he? Your Honor, pursuant to the district court procedures, we provided a list of facts that we believe were undisputed. Yes, but he had ruled, he had to take the facts in the light most favorable to the other side. He did, but. From you. And he not only says he didn't give him the facts, he said he was erroneous on facts. He thought he thought he kind of assumed that he had a clear error standard. He had to prevail on me. He has to, he just has to show that the judge took the facts in your favor. And that's wrong. He had to give the facts to the other side that he's ruling it. Right, Your Honor. I certainly understand that. Are you saying you had to submit facts and you submitted facts and they didn't contest those facts? Correct, Your Honor. So one of the procedures used by that district court, those then became undisputed facts. In other words, for summary judgment, there's no question, which is a question of material fact. It is no question of as to those facts because they didn't object at all in your filings. Exactly, Your Honor. So you say those facts, maybe among others, become the uncontested factual findings. They exist as a matter of law. Correct, Your Honor. Those are facts that are admitted. They're conceded by the. Right. Okay. So they're admitted facts, admitted by the other side. Yes. They can't be findings because the judge non-titled make findings. Correct. Correct. Yeah, those are facts that were not disputed and the judge relied on. And we do have. I guess he can make a finding that they're uncontested, but he couldn't decide a disputed fact. Right. I don't believe that Judge Ellis made any sort of error in making a factual determination where the sides had competing factors. I mean, those six pages of bullet point facts in his order come directly from the record of testimony of evidence that was collected in discovery in this very short timeline that we had. And those were facts that were undisputed, as you mentioned, under the procedures of the court. What about for what it's worth? He said you admitted you did a search. I remember the record, but I can't put my fingers on it right now, that she admitted you did a search. So he said you had to see their mark. So you admitted you saw their mark. Well, Your Honor, I think the more important fact is that it's undisputed, and they've admitted this, that we selected the mark before we ever knew of them. That's really what the focus should be because this mark was selected. Before you ever what? Before we ever knew of Valador. That's an undisputed fact that Judge Ellis relied on. They took a position testimony. How could that be consistent with the fact that you did a search? We should have shown that up, shouldn't it? Well, it's often a commercial practice that parties, the marketing department of a company might move forward and then later on the legal department might get involved. But in this context, the word Vive was selected by HTC originally as, and this is also in the record, as Revive, which was to maintain some consistency with some other product lines that the company had, and then they changed it to Vive because, frankly, Revive doesn't. So you're saying it's consistent with the fact, though, that you picked it not to do anything wrong, which you picked it, and then you later did a search? Correct, Your Honor. Did that search show up their mark? I don't, Your Honor, that's not in the record. I would point out that somewhat inconsistently in their reply brief, on the one hand, they make this argument that we must about them, but on the other hand, they state very explicitly that we chose this word at random, which they used to try to support their argument on the strength of the mark. So there's some inconsistency in their position. But you don't think that really matters in the grand scheme, do you? I don't, Your Honor. I didn't think so. No. In the grand scheme of this, you know, our position is that Judge Ellis made no errors. I'm happy to walk through some of the factors. I think that, you know, the sophistication of the consumers, if you look at the Perini case, which is a Fourth Circuit case, in that case, the court made some very interesting statements. That was a case about construction companies. But specifically, and I'm quoting from the case. What do you think about the sophistication of the consumer in this case? You have to know that we know the record and know who the consumers are, but just, you don't have to cite passages from a case, but just tell us what you think the law is as applied to the facts of this case. Well, the ordinary consumer in this case, for purposes of reverse confusion, would be these procurement officers at NASA and the Department of Veterans Affairs. And that's because these are their customers for 90, 95 percent of their sales or revenue? Yes, and, Your Honor, it's actually a bit higher than that. But these are. But it's 98 percent of revenue, I think. I believe that's right, Your Honor. Yeah. These are highly, and again, to go back to the Perini case, this was a very similar case, and the court mentioned that highly trained procurement professionals whose sensitivity is heightened by the responsibility of sensibly spending millions of dollars. That's who we're dealing with. Wait, wait, wait, wait. You just lost us when you said that somebody in government contracting is very sophisticated and highly sensitive. Are you sure about that now? You want to stand on that? That's just what the decision says, Your Honor.  A little bit of translation. But the point is here, you think this is NASA, and NASA does, honestly, I think most people would say among government agencies, that's one of the most sophisticated for a lot of reasons. First, for what they do, cutting edge that they are in a lot of areas, and quite frankly, that they do actually in part of their process anyway, they put people's lives at stake knowingly, correct? Correct. And so you can, it's fair to think that would be fairly contract matters for them. Correct, Your Honor. And I think in the confusion context, it's important to keep in mind, too, that these are competitive bidding processes. And we have, in the record, unrebutted testimony from a government contracting expert who explains how Valador obtains its contracts with the government. These are not, you know, backroom deals. This is an open RFP that they're responding to. The procurement officer is reviewing multiple bids. The chance of that sophisticated individual being confused into thinking that they're somehow going to end up with You think those people would be sophisticated enough to figure out the difference if they solve a question? In other words, if they saw the other mark and they would go, what the heck is this? This is who we, isn't it? It looks like the kind of people we contract with, that they would be sophisticated enough to figure out the difference. Absolutely, Your Honor, especially given that, as explained in the briefs and in the record, it's undisputed that HTC uses the word VIVE with the word HTC or HTC's unique logo. Didn't one of them use a logo almost exclusively? I mean, almost all the time. Correct. Who is that? That's HTC. From a branding perspective. So when you use the word VIVE, you also had then something else with it. Correct, Your Honor. Either HTC, we also have a blue triangle. Was it required that you had that or is that just what you did as a practice? It's company policy from a marketing perspective. So you aren't required by law or anything. Not by law. It's just what you do, how you use your mark. Correct, absolutely. Do you have any protection over your mark? We do, Your Honor. We have trademark rights throughout the world. HTC is a global company. This product is sold globally. We have rights internationally. We also recently obtained rights here in the U.S. Our HTC VIVE mark is now registered provisionally with the Patent and Trademark Office. That was over Valador's objection. Did you say HTC? HTC. HTC. I was going to say, I think you're running up against another mark if you have HTC. No, Your Honor. Okay. Who made that Brownsville climber video? Your Honor, that issue is a little bit of a distraction in the case. That's what my question was going to be, if you could answer me. What does it have to do with this? Absolutely nothing, Your Honor. Who made it? Well, somebody at Valador in a non-commercial capacity. Somebody at Valador? Correct. That was what my question was. Yeah. Who made it? They made a thing about the Brownsville slammer. Correct, Your Honor. That's a penitentiary over in West Virginia. Correct, and as one of their government... It's not used anymore. Correct. As one of their government contracts, they had done basically a 3D rendering of that. And so some employee of Valador decided to take that and he perhaps was a fan of the Live for Dead game, which I don't play, but created this map which overlays on this video. It's some kind of a video game. The Brownsville slammer itself is not a video game. It's a map that overlays and kind of changes the environment that the player... Is the map a penitentiary laid out? It is, Your Honor. Oh, is it?  But it's completely irrelevant for this case because it's not branded in any way with V.I.T.E. Well, that's kind of what I thought. I thought that somebody thought it had any relevance. None. You don't think it does? Do you think the other side thinks it has any relevance? Absolutely, Your Honor. They keep bringing it up. Okay. You want to walk through their five strongest points, the ones they think they went on, and just for my edification, respond to them in a sentence or so. I can roll through them if you want me to. Sure. I think I can. Similarity of the two marks as to consumers. We've talked about that, right? Correct. You don't think there'd be any similarities to these consumers? Not to these consumers, Your Honor. You also mentioned similarity of goods and services. You say that's entirely different. We sell a hardware product which, as in the record, it states it sells for $7.99. It's recently the price has gone down because it's gaining some traction. It's $5.99. The consulting services sold by... $799. $799. The consulting services sold by Valador range from $100,000 up into the tens of millions of dollars, completely different products. Similarity of advertising used by the two of you. Based on the record, Valador does almost no advertising because they're responding to RFPs. The advertising that's done by HTC is extremely targeted. In fact, in the record, it's explained that HTC only advertises to people who have visited the HTC website and specifically shown interest in this, in the context of internet advertising. Let me go to another. Certainly, Your Honor. Strength and distinctiveness of the plaintiff's mark is actually used in the marketplace. Strength of the mark, Your Honor. That was the first one we talked about. The similarity. No, the similarity of the two marks. Oh, strength. Oh, sorry. Strength or distinctiveness of the mark is actually used in the marketplace. Right. So, Your Honor, we believe that the mark that Valador has is weak. It is an acronym. It's been registered by 64 other entities, including nine in its class, which it's very focused on. There are 32 other companies who are using that mark in the same space. There are 20 mobile applications using VIVE or some variant of VIVE. Just from my edification, is it hard these days to find any word that somebody hadn't used or doesn't use in some other context? It's extremely hard, Your Honor. Yeah. I suspect because people are thinking about it, they maybe try to register everything possible to kind of cover. They do. Not that the other side is doing, but it's sort of that cyber squatting or looking at, it used to be fight over the domain names and all that. But it seems to me, it's pretty hard to come up with the word that somebody else doesn't use in some context. It is very hard and you need very creative people. But ultimately, it's very difficult because you trademark certain variables. Sometimes we have very creative people making arguments to us here. I believe it, Your Honor. And last is the defendant's intent. What evidence of that is in this record? Your Honor, the only evidence is the undisputed fact that we chose the name without knowing who they were. That's undisputed. Does that intent go only to your choice of it or to your continued use of it? Actually, Your Honor, the intent factor has to go to the intent to mislead their customers. That's right. And we didn't... Well, wouldn't that... So then it would seem to me that even if you chose it not knowing, if you later found out, there could be some evidence of intent. But you think that's washed out by the intended customers? The intended customers involve the fact that legally, the intent has to be intent to mislead. We don't even mark it to the same customers. That's what I mean, but that's washed out by the customers factor. So even if you didn't know about the time of their mark when you chose yours, if you later found out about it, you still would win because he says you had to know about it once you did that search. You heard him say that. I did hear him say that. But I'm saying even if you give him that, then it leads to the point you would say, it doesn't show we, even though we, if we did, assuming we did, for sake of the question, when we get to that point, he still doesn't win on intent. You say intent to deceive because the customer issue, clarify that and wash that through. Because you aren't trying to deceive his customers because you don't really deal with his customers. Correct, Your Honor. I know I'm out of time, but just quickly, the one district court case that they rely on to sort of, I think, mischaracterize this legal standard about intent, it's intent as it relates to the trademark rights. So it's knowledge of their rights. So even if we later learned about their trademark, it's clear that their rights are very different than our rights. We have rights in the name too, but our rights are in virtual reality hardware. Theirs is in government consulting services. And their rights come up because you had the mark, you had the mark rights over your mark. Is that correct? Correct, Your Honor. So theoretically, if they were to move into our space, we could sue them. All right. Okay. All right. Thank you, Your Honor. Thank you, sir. Mr. Cahill. Yes, a few comments. First of all, the defendants don't only sell hardware. Their goggles have built-in software that displays 3D images. They call it firmware, but firmware is a type of software. So I got to respond to the statement that the defendants only sell hardware. Just not the case. The survey, which we believe the trial court erred in excluding, as the survey itself says, the selection of the images of Vive were not, it wasn't just haphazardly done. The survey, the person who put together the survey went to Valador and pulled an image of Vive that Valador uses and put that in the survey. And then I believe went to something called Reddit, but pulled from that a version of the image that the defendants used. It used those images side by side and presented it in this blind survey. So there wasn't some bias imposed by the person who did the survey together to create images that artificially looked alike. They were identical based on the two different sources from which they were drawn. Reverse confusion, of course, what's the harm from it? It impacts the senior user's ability to expand into a market. The evidence that it was excluded, in addition to the Moundsville Slammer, which was not excluded, and you ask about, well, what's the relevance of the Moundsville Slammer? It shows that for a period of time, for years before HTC and other defendants surfaced, Valador was exploring, testing the market to expand into the recreational video game field. They call them maps, but this Moundsville Slammer, I'm not a video gamer, but you play a game with zombies using the Moundsville Slammer. I think that any kind of common parlance, it's a video game. You can't play it by itself. It overlays onto an existing software program, but it is software. It's 3D software that Valador had actively launched itself into to test out the marketplace. Evidence that was excluded in error showed that Valador, its software, its 3D software could be displayed on various instruments, including goggles. There are photographs going back years ago where one of Valador's engineers was displaying or viewing the Valador Vive software on a set of goggles. There was excluded evidence about an application. Was that Moundsville Slammer map, was it branded with Vive? No, and here's the reason why. How could anybody be confused? This goes into the reverse confusion damage about us going into the marketplace. Valador wasn't ready at that point in time to go out into the recreational marketplace. It hadn't proven its ability yet. It didn't know if its product was attractive to the recreational market. It didn't know how to... So going back to what Judge King had asked earlier, what possible relevance does Moundsville Slammer have to this when it wasn't even branded with Vive? Because it shows that Valador was looking into expanding into the recreational market, and one of the damages, one of the harm from reverse confusion is that the defendant's saturation in the market in that field using Vive prevents us. Adversity impacts us. You just want to use that to show you are looking at ways that you would use your mark differently than is a predominant way to use it. Yes, and specifically into that marketplace, and there's evidence that we were actively exploring that, but now we're prevented from doing that because if you go online, you find 280 million people look and see that Vive is not us. So for us now to go into that field that we explored actively, we can't do it. We're prevented from doing that. A prime identified damage resulting from reverse confusion. Now, the statement that the defendants always, always was a statement used Vive with some other words. It's just not the case. The evidence is if you go on to the HTC website, it says, in quotes, Vive, Vive, Vive. They identify it by itself. They have a website, Vive, Vive.com. I don't know if it's true or not, and I think I asked that question, and he didn't answer my question. At least my question was, is it used with icon or logo, not with other words as I remember it? Sometimes yes, sometimes no. Again, if you go to their website, at least back in the time, on it, they talk about Vive, and there's a statement in it telling consumers, buy, and they just say, Vive. Doesn't say HTC Vive, it says, buy, Vive, and separate, of course, the website that we referenced is purely Vive, Vive.com. Not HTC Vive, that's separate, which is simply Vive.com. Thank you. Thank you, Mr. Cato. We appreciate it very much. We're going to come down and greet counsel and then take a quick break.
judges: Robert B. King, Dennis W. Shedd, Stephanie D. Thacker